Filed 8/27/24

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE, | H050156 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C2103529) |
| v. | |
| JERMAINE RANDY HOWARD, | |
| Defendant and Appellant. | |


Defendant Jermaine Randy Howard shot a man at an unlicensed nightclub in San Jose. At trial, Howard testified that he acted in self-defense. A jury rejected Howard's claim of self-defense and convicted him of second degree murder.

After the jury's verdict but prior to sentencing, Howard filed a motion alleging the prosecutor had violated the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 3.5; Pen. Code, § 745[1]) (hereafter RJA or Act). Howard asserted the prosecutor violated the RJA by cross-examining him about his connection to East Palo Alto. The trial court denied the motion, deciding Howard failed to make a prima facie showing of an RJA violation, and sentenced him to prison for 19 years to life.

On appeal, Howard contends the trial court erred in denying his motion because he had demonstrated violations of the RJA and due process clause. Howard further contends the prosecutor violated the Act and due process by arguing to the jury that the victim's

---

[1] Unspecified statutory references are to the Penal Code.

use of the n-word before the shooting was not offensive in Howard's "world."[2] Additionally, Howard asserts that the jury instructions misstated the law regarding murder, imperfect self-defense, and heat of passion and the alleged errors were cumulatively prejudicial.

For the reasons explained below, we decide that the trial court erred in concluding that Howard had not made a prima facie showing of a violation of the RJA as to the prosecutor's cross-examination. We thus conditionally reverse the judgment and remand for further proceedings on Howard's motion. We reject Howard's claim of instructional error.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In January 2022, the Santa Clara County District Attorney filed an amended information (information) charging Howard with the murder of Reinol H.M.[3] (§ 187, subd. (a); count 1). The information further alleged that Howard personally and intentionally caused Reinol's death with a handgun when committing the murder (§ 12022.53, subd. (d)) (hereafter firearm enhancement), personally used a handgun (§ 12022.5, subd. (a)) when committing or attempting to commit the lesser included offense of voluntary manslaughter (§ 192) and was out of custody on bail when he committed the charged offense (§ 12022.1, subd. (b)) (hereafter out-on-bail enhancement). In addition, the information alleged various circumstances in aggravation (Cal. Rules of Court, rule 4.421(a), (b); § 1170, subd. (b)).

---

[2] Throughout this opinion, and consistent with the usage of the parties at trial and on appeal, we use the term "n-word" when referring to the racial slur that Howard testified to at trial and further use dashes when quoting that word from Howard's testimony. (See *People v. Ware* (2022) 14 Cal.5th 151, 159, fn. 1.)

[3] We refer to the victim and certain witnesses by their first name and the first letter of their last name to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10).)

In March 2022, the jury convicted Howard of second degree murder and found the firearm enhancement allegation true.[4]  In a bifurcated proceeding, the trial court found true the out-on-bail enhancement allegation.

In May 2022, Howard moved to vacate the verdict and for a new trial pursuant to section 745 (hereafter RJA motion).  Howard alleged violations of the RJA and his due process rights based on the prosecutor's "repeated questions" during cross-examination "trying to connect [Howard] to East Palo Alto."  Howard also filed a sentencing brief and request to strike the firearm enhancement under sections 1385 and 12022.53.

In June 2022, the trial court heard argument on Howard's RJA motion and denied it.  The court concluded that Howard had failed to make a prima facie showing of a violation of the Act. The court did not explicitly address Howard's due process claims.

The trial court sentenced Howard to 15 years to life in prison for second degree murder (count 1) consecutive to four years for a firearm sentencing enhancement (§ 12022.5, subd. (a)).  The court effected this sentence by, in the interest of justice (§ 1385, subd. (c)(1), (2)), striking the punishment for the firearm enhancement found true by the jury, dismissing that enhancement allegation, and imposing a consecutive four-year midterm enhancement under section 12022.5, subdivision (a).  The court also struck the punishment for the out-on-bail enhancement and dismissed that enhancement allegation.

B.  *Evidence Presented at Trial*

    1.  <u>Prosecution Evidence</u>

In the early morning hours of February 20, 2021,[5] Reinol was at an unpermitted "after hours nightclub, strip club" in the basement of a building in San Jose.  Anthony

---

[4] The verdict form for the second degree murder conviction stated that the jury had found Howard "not guilty of first-degree murder."

[5] Unless otherwise indicated, all dates were in 2021.

Watson operated the club with another man, Tameem Raheem. Reinol and Watson were acquainted.

Howard (aka "Maine") arrived at the club around 5:00 a.m. with two men and a woman named Marissa C.[6] There were approximately 20 people in the club. Howard ordered a bottle of liquor.

Approximately 10 to 15 minutes after Howard arrived, he greeted Reinol with "a little handshake." According to prosecution witness Tyra P., Reinol had previously attended an afterhours event hosted by Howard on the east side of San Jose (in March 2020). Reinol and Tyra had also attended a couple of gatherings at Howard's house in East San Jose (in April or May 2020). On cross-examination, Tyra testified that Reinol and Watson were from Oakland and grew up in the same Oakland neighborhood.

Josephine V. was a waitress at the club on the night of the shooting (February 20). She knew both Reinol and Howard. Shortly after 5:00 a.m., while Josephine was in the "kitchen area" of the club, she heard gunshots. After waiting "a little bit," Josephine exited the kitchen area and saw Reinol sitting on a couch. He had been shot. Josephine did not see any guns. As people crowded around Reinol, someone said, " 'It was Maine.' "

Dominicqueca T. was working as a dancer at the club that night and standing next to Reinol when he was shot. Dominicqueca testified that she knew Howard but did not see him there. She also testified that prior to the shooting, Reinol had been "chilling" on a couch in front of a stripper pole, "smoking, doing his thing." She did not hear any arguments immediately before the shooting.

---

[6] Pursuant to a stipulation, the trial court informed the jury that Marissa was not available to testify for either party. The court also instructed the jury not to draw any inference from Marissa's failure to testify or speculate about what she might have said if called as a witness.

4

Dominicqueca heard a loud noise that startled her and saw Reinol (who was sitting on the couch) "put his arms up." He placed his left hand in front of his face in an apparent "blocking move." Dominicqueca also saw a person approaching from about eight feet away with "a bubble jacket, and a gun" that had an extended magazine. According to Dominicqueca, the shooter was "walking and aiming" the gun. The shooter's arm was extended at a downward angle, pointing toward Reinol on the couch. Dominicqueca heard two shots. She did not look at the shooter's face and ran away.

After the shooting, Dominicqueca saw a man wearing a bubble jacket "walking casually . . . up the stairs" before the lights in the club were fully turned on. The man was walking slowly and normally while others in the club were running. Dominicqueca approached Reinol to render aid. She applied pressure to Reinol's lower abdominal wound. Reinol "kept saying that, 'they killed me. They killed me.' " Dominicqueca did not see Reinol with a gun.

Josephine ran to get her car so she could take Reinol to the hospital. People carried Reinol upstairs to the street and placed him inside Josephine's car. Josephine drove him to the hospital, where he died later that day.[7]

According to a forensic pathologist, Reinol had been shot twice. He had two entrance wounds (one in his chest and another in his abdomen) and two exit wounds in his back. The entrance wounds were higher on Reinol's body than the corresponding exit wounds, indicating the bullets passed through Reinol from front to back and downward.

On the couch at the club where Reinol had been sitting, police investigators observed blood and two bullet holes. The police recovered two intact bullets/projectiles from inside the couch. They also located bullet fragments and one cartridge casing at the crime scene. A firearm analysis determined that the two bullets and most of the

---

[7] The parties stipulated that the police searched Josephine's and Reinol's vehicles and "did not find any cell phones or wallet belonging to Reinol [], nor any weapons."

fragments were fired from the same gun, and the fragments could have come from additional shots.

On March 18, law enforcement officers approached Howard on a street in Santa Rosa to arrest him on a warrant for murder. Howard fled from the officers, "jumping over fences." An officer yelled " 'Stop. Police,' " but Howard continued to run until the officers caught up to him.

At trial, the prosecution introduced a letter that Howard had written on an "Inmate Request Form" and was seized by police from Marissa on April 2. In the letter, Howard said (among other things) " 'Do not speak of this letter to anyone.' " He also indicated he would be pleading " 'self-defense.' "[8]

---

[8] The letter includes the following: "Do not speak of this letter to anyone"; "Read it then destroy it"; "*[Watson] and [Raheem] snitched on me*"; "If they ask about my homies that night say you don't know them and we met them at Santanna [sic] Row that night"; "[A]lso, you don't know what I did after I left you at your friend[']s house. And you were told by a friend that they let this guy die because they didn't want to call the police and till [sic] they could hide everything that they had illegal in the place."; "I am going to plead 'self [d]efense.' Eventually they (Police) will contact you – Do not speak with them – wait to speak with my attorney."; "I need you to say: 'that night it was your [i]dea to go to this after-hour and you knew about it because of [Raheem]. We met up in Santanna [sic] Row for some drinks then left to this party that you knew the address too. We were there for maybe 20 min[utes] and this guy came over and started arguing with Maine. He called Maine "a Pussy or something like that," then sat down and reached under his shirt like he had a gun. It was dark. Then Maine pulled out and shot him in the shoulder – then aimed at the front door. Then we went to the front door w[h]ere he opened it slowely [sic] because he believed another [g]uy named [Watson] was going to shoot at him. Instead [Watson] and [Raheem] were [r]unning down the street and we got into the car and drove away. After we picked up a friend from Santanna [sic] Row[] and went back to her house on First [S]treet. We didn[']t discuss anything with her. I know from other people that these guy[]s had jumped him a couple of months before this situation happened. Also a lot of them had guns visible when we entered.' "; " 'The next day people started spreading this [r]umor that Maine shot this guy for no reason and I wanted to come to his defense – but he asked me not to.' I was sitting right there."; "[T]his is all I need you to say Ma. But only to my attorney. Do not speak with the Police. If asked about things you don't remember just say that we were drinkin[g] and had taken X.T.C. that night."; "Julia [] contact D.J. or Marrissa [sic] and tell them that

6

2.  Defense Evidence

Howard presented the testimony of five police officers who had spoken with Josephine at the hospital and collected Reinol's belongings.  Howard also called an expert witness on cell phone record analysis.  The expert testified that after the shooting, a phone associated with Reinol had connected to cell towers in the same vicinity as Watson's phone, including in Oakland.

Howard testified on his own behalf.  He told the jury that he was born in "Palo Alto" and raised "[b]etween Menlo Park and San Jose."  He acknowledged suffering a prior arrest in November 2018 for possessing a loaded gun in his car and prior convictions in July 2008 for felony assault with force likely to produce great bodily injury, in April 2007 for felony assault with force likely to produce great bodily injury and misdemeanor false imprisonment, and in April 2006 for giving a false name to a police officer.

On the night of the shooting (February 20, 2021), Howard socialized with Marissa—whom he was dating and had known for a couple of years.  They went to a few parties and ran into two men, one of whom Howard knew "from parties and being around and other people in common."  Howard drank alcohol and took "some molly, which is a form of ecstasy."

Eventually, Howard, Marissa, and the two men decided to go to the afterhours nightclub in San Jose.  The interior of the club was dark and "had all the club lights floating around."  Howard ordered a bottle of liquor and waited for a place to sit. Howard saw Raheem, gave him a fist bump, and talked with him as Watson walked up to

---

this letter is for Marrissa [*sic*] and not to talk about it with <u>any body</u> [*sic*] <u>else</u> period.";
"Do not let my [Baby Mama] know"; Tell them nobody can know about this letter except
these 3 people"; and "The letter is for <u>Marrissa</u> [*sic*] only."  (Some underscoring is triple
underscored in the original.)

them.[9]  Howard did not speak with Watson.  Howard observed "maybe five or six" guns possessed by others inside the club.

After Howard and his group took seats in a section of the club, Reinol approached Howard.  Howard said, " 'Hey.  What's up, man?' " and extended his hand to Reinol.  They shook hands, and Reinol said that Howard "needed to check with [Watson] to make sure that everything was squared away between [Howard] and him for an issue that [they] had before."  Howard replied that he "wasn't there for [Watson]" and " 'I don't know why I need to square anything away with [Watson].  This is [Raheem]'s after-hour.' "  Howard felt "slight annoyance" at Reinol's request and thought that Reinol "must have an issue" with him.  Howard responded, " 'Well, let's go talk to [Watson], and . . . square whatever away.' "

Howard and Reinol walked over to Watson.  Howard said to Watson that they should "put [] in the past" whatever had happened previously and " 'we're just trying to have a good time.' "  An "agreement was reached" on Howard's purchase of liquor, and Howard went back to where he was sitting.  Howard smoked marijuana, observed the dancers, and drank from a bottle of liquor that Reinol had delivered.

A short time later, Reinol returned to the section where Howard was sitting with two or three men standing behind him.  Two additional men approached from the side, putting Howard's group "in a semicircle."  Howard was standing with his two male companions.  Reinol's "intention was focused more on the . . . gentleman [*sic*] that [Howard] was with."  Reinol's "demeanor was kind of hostile" and he started asking Howard's companions "where they were from."  The men responded, " 'Where the fuck you from?' "  Reinol said he was from Oakland (23d Street), and Howard's companions replied that they, too, were from Oakland (26th Street).  Although Howard testified about

---

[9] Contrary to Howard's testimony, a surveillance video showed that Raheem had left the club before Howard arrived.  Howard conceded at trial that he did not "know why [he] felt like [Raheem] was there" at the time of the incident.

listening to this exchange, he did not testify to saying anything about where he (Howard) was from.

The conversation between Reinol and Howard's companions made Howard feel "it's going to go down." He testified that "depending on what . . . side of life or what walk of life you live on, asking somebody where they're from . . . or . . . questions like this, if you are in the streets, this can . . . have deadly consequences. If you answer the wrong way, you don't know what's going to take place. So it always will put somebody on the defensive immediately. Like, you don't . . . know what's going to happen here."

After a further "exchange" between Reinol and Howard's companions, it "became clear . . . that they weren't able to intimidate . . . them or us [*sic*]." Howard then "kind of laughed, like, 'What the fuck, man? [] Like, dude, you know, what's all that about?' " Howard's reaction seemingly "ticked [Reinol's] pride," because Reinol looked Howard "up and down" and said, " 'Well, I ain't one of these bitch-ass n[---]as from San Jose.' " Howard took Reinol's comment "personally" and said, " 'Man, you a bitch.' 'Who you calling a bitch?' " Reinol responded, " 'Man, you a bitch.' "

Because Howard was the only person in the group from San Jose, he felt that Reinol's comment was directed at him. Howard had "a whole bunch of mixed emotions" going through his head. He was offended, "definitely angered," and "definitely [] aware that [his group was] outnumbered." He also "was scared from the beginning when they first walked up."

Howard testified that when he called Reinol "a bitch back, [Reinol] . . . reached under his shirt, and he said, 'I got you a bitch right here.' " In Howard's "head that meant if I called him a bitch again, he was going to shoot me. So you know, I got scared. I was afraid. I didn't . . . say anything. . . . [W]e just kind of . . . both stood, looking at each other." Howard testified further, "It was kind of like a high noon standoff. And I . . . conceded. And I just . . . turned to the . . . people I was with, and I was like, 'Let's just go ahead and get up out of here.' "

9

Howard explained that "at first [he] wasn't [] worried about anything because [Reinol] didn't pull anything out." Reinol "kept staring" at Howard and eventually sat down in Howard's section with a "malicious" "look of . . . triumph" and "put his hand back up under his shirt."

Howard "turned sideways" and put his hand inside of his sweater. Howard "felt like these guys were going to try and do something to us." Howard saw "one of the guys" (who he thought was Watson) walk over to the club's door and "exchang[e] a firearm with another guy. And then when [Howard] looked back, [he] noticed that [Reinol] had the gun out. And he had it on the side of his leg." Howard was "afraid" that Reinol was going to shoot him, so Howard "just responded."

About the shooting, Howard testified, "I tried to shoot [Reinol] in his arm as fast as I could. I wanted to just make sure that, you know, he couldn't harm me or [] shoot me. And, you know, that's when that happened."

Howard recalled pulling the trigger twice. He testified that he fired the first shot in a "fast-moving motion" as he "was swinging the gun up." Howard thought he missed Reinol with the first shot and hit the couch. Howard "tried to hit [Reinol] in his arm" with a second shot. Howard conceded the possibility that he had fired a third shot, but he could not recall firing three times. Howard testified that he did not intend to kill Reinol. He also testified that, in response to the shooting, Reinol was "screaming, telling other people to shoot [Howard]."

According to Howard, about two minutes elapsed between the time Reinol and his cohort approached Howard and Reinol's post-shooting exhortations that someone shoot Howard. Howard explained that the shooting happened quickly, and he was "afraid" and "terrified." He also testified that he was "more apprehensive" during this incident because he had previously been shot twice (on separate occasions and while unarmed) at afterhours events.

10

After he shot Reinol, Howard told "everybody to go," looked toward the door, and "kind of aimed towards the door because [he] felt like . . . one of the[] other guys was going to try something." Howard "walked backwards" toward the door and went up the stairs. He exited the club with Marissa and his two male companions. He got rid of his gun about an hour after the shooting by dismantling it and throwing it in a trash can. Later that afternoon, Howard learned that Reinol had died.

Howard testified that he had owned the gun he used to shoot Reinol for approximately six months to one year before the shooting. He explained further that he carried a firearm with him "everywhere" since opening a food truck business a few years earlier.

Regarding the letter seized from Marissa, Howard said that he had written it to her about two days after his arrest. He had previously spoken with Marissa about the shooting a couple of times, but he wrote the letter before he had seen any of the evidence the police had against him. He wanted Marissa to know that he was in custody and "that it was okay to tell the truth." He also wanted to "give her a warning about" possible contact by the police.

Howard explained that he wrote about pleading self-defense because he "kind of [has] an idea of court proceedings" and "was going to plan to defend [himself]." He wrote the words " 'I need you to say' " because he felt Marissa "might possibly be . . . reluctant to . . . say[] certain things" and "some people don't want to be involved in these type of situations." He explained further, "But I also wanted to make sure that I reminded her [of] the specifics . . . because she was there and she'd seen what happened . . . so I wanted to make sure that . . . I reminded her exactly what I needed her to say for me." Howard testified that he underlined a phrase in his letter stating that Reinol " 'sat down and reached under his shirt like he had a gun' " because he "believed that's what [Marissa] had seen" and "felt like it was a key point."

11

Regarding his instruction to Marissa that she should not speak to the police, Howard explained that he "would not trust the police at all." He continued, "There is . . . no reason to trust the police, in my opinion. I've had no good experiences from trusting the police or dealing with the police in [the] past. I've never seen a police [officer] do anything good or help anybody."

On cross-examination, Howard acknowledged seeing Reinol at other afterhours events and that Reinol had attended a party at Howard's house. Howard said he "never specifically had a problem with [Reinol]. Just other people."

Howard conceded that in his letter to Marissa, he did not say anything about Reinol actually having a gun during the incident. He also conceded that when Reinol held his gun beside his leg, he did not point it at Howard or fire it. Howard agreed that sounds captured on a recording from the nightclub revealed "a pop, a pause, and then two pops in quick succession," which suggested "a first shot into the carpet and then two shots into [Reinol]."

Howard admitted that he obtained a new phone two days after the shooting, deleted photographs from the night of the shooting, and went to Texas for a couple of weeks to "put some distance between" himself and what he had done. He conceded that he did not want the police to learn the identity of his two male companions. He admitted that he had lied to the police after his arrest when he denied that he had shot Reinol.

## II. DISCUSSION

Howard raises four claims of error. He contends: (1) the prosecutor violated the RJA and constitutional due process protections by cross-examining him about whether he grew up in and was connected to East Palo Alto (first RJA claim); (2) the prosecutor further violated the RJA and due process protections by arguing that Reinol's use of the n-word before the shooting was not offensive in Howard's " 'world' " (second RJA claim); (3) the jury instructions misstated homicide law regarding murder, imperfect self-defense, and heat of passion; and (4) the alleged errors were cumulatively prejudicial.

We address Howard's claims in turn, discussing his RJA claims together.

A. *RJA Claims*

1. Additional Background

a. Trial Testimony Regarding Personal and Geographical Backgrounds

At trial, the prosecutor and defense counsel elicited testimony from witnesses about their personal and geographical backgrounds, as well as about Reinol's and Watson's geographical background.

In presenting the testimony of Josephine V., Dominicqueca T., and Tyra P., the prosecutor asked about their personal and geographical background, including their place of birth, age, location of their upbringing, high school, other educational background, and work experience.

When defense counsel cross-examined Josephine, counsel asked if Watson and Reinol were "from Oakland." Josephine responded, "I believe so." Similarly, when cross-examining Tyra, defense counsel elicited that Reinol and Watson were from Oakland and grew up in the same Oakland neighborhood.

In presenting Howard's testimony, defense counsel began the direct examination by asking Howard about his personal and geographical background. As mentioned *ante* (pt. I.B.2.), Howard testified that he "was born in Palo Alto, California" and raised "[b]etween Menlo Park and San Jose - - my whole life."[10] Howard further testified that he graduated from Fremont High School in Sunnyvale, participated in a culinary program in Redwood City, and attended barber school. He worked in a restaurant (making his way up from waiter to management), "went to private chef'ing [*sic*]," "did a lot of catering events," opened his own food truck, and cut hair. He described feeling like "a renaissance man." His licensed food truck business was called "Maine's Shrimp and

---

[10] By contrast to Howard's testimony that he was born in "Palo Alto," in a pretrial motion for bail review, Howard's defense counsel declared upon information and belief that "Howard was born in East Palo Alto."

13

Grits." He maintained an Instagram account for his food truck and was a "paid promoter for almost all of the nightclubs in San Jose." He also promoted afterhours nightclubs.

After Howard testified about his background, the prosecutor noted that the parties and trial court had discussed "in the hallway" the prosecutor's position that Howard's testimony regarding his "culinary education, his desires to become a chef, and work as a waiter . . . presented a false aura of veracity." The prosecutor explained, "Mr. Howard has multiple cases involving drug sales. He was on probation for possession of narcotics for sales. He had $20,000. He had several ounces of cocaine. He had fentanyl, ecstasy, which he's admitted he took on that night. [¶] And I think that . . . the insinuation and presentation that Mr. Howard only derives his income from legitimate means is a false presentation of reality."

The trial court disagreed with the prosecutor, noting that Howard had admitted promoting illegitimate afterhours clubs. The court said, "I don't see that false aura . . . really arising here." The prosecutor responded that "there's a critical distinction between an infraction for running an unpermitted nighttime business and selling ounces of cocaine and having stacks of cash in a trap house." The court replied that it was "going to stick with" its in limine ruling and not allow the prosecutor to impeach Howard with the "various kinds of crimes or bad conduct" that the prosecutor had offered as impeaching of Howard's veracity.

Later, on cross-examination, the prosecutor asked Howard the following questions about his background (without any defense objection):

"Q. You testified a bit about where you grew up, and you went to Fremont High School in Sunnyvale. Didn't you grow up in East Palo Alto?

"A. Yes. I grew up in Palo Alto, Mountain View, Sunnyvale, Santa Clara. My family kind of bounced around a little bit.

"Q. I know. But you have more of a connection to EPA [(i.e., East Palo Alto)]; right?

14

"A.  Yeah.  My mother is from Palo Alto.  She worked [at] Stanford Hospital her whole life.  Several of my relatives work there.  And . . . my brother was a Stanford sheriff.

"Q.  Well here's what I'm getting at:  You have more of a connection to East Palo Alto than the Palo Alto connection that you're talking about right now; correct?

"A.  Yeah.  But, I mean, Palo Alto is Palo Alto.

"Q.  You don't distinguish between EPA and Palo Alto?

"A.  In the streets, but not necessarily just in general life.

"Q.  Okay.  But in the streets you have represented for a long time that you're from EPA, right?

"A.  Yeah.  Actually, Menlo Park.

"Q.  Okay.  Menlo Park, EPA - -

"A.  Yeah.

"Q.  - - interchangeable?

"A.  Yeah.

"Q.  Okay.

"A.  Kind of, sort of.  But there's differences.

"Q.  Some distinctions, but generally it's EPA and Menlo Park, right?

"A.  Yes, sir."

Defense counsel elicited the following responsive testimony on redirect examination:

"Q.  [Mr. Howard], you had told us you were born in Palo Alto; Is that right?

"A.  Yes, ma'am.

"Q.  And where did you move after Palo Alto?

"A.  Sunnyvale, then eventually, Santa Clara, then eventually, San Jose.

"Q.  How old were you when you moved from Palo Alto to Sunnyvale?

"A.  I was 10 years old.

15

"Q. How old were you when you were living in Sunnyvale - - approximately?

"A. I'm going to say between 10 and, like - - 10 to 18.

"Q. And is the high school you attended in Sunnyvale?

"A. Yes, ma'am.

"Q. And then you said you went to Santa Clara at that point?

"A. Yes, ma'am.

"Q. And how long did you live in Santa Clara?

"A. Well, where I lived was kind of on the borderline of San Jose.  So I would say for the rest of my life I've been in San Jose.

"Q. Okay. So when you say San Jose, you're referring to - - I'm sorry - - Santa Clara, you're basically referring to that as San Jose?

"A. Yes.  I lived - - I believe I lived in the heart of - - not really the heart of Santa Clara.  I lived off of, like, Monroe and San Tomas for maybe about a year.  And eventually I moved down to, like, the Saratoga and Kiely area.  And then I've just been there for the rest of my life.

"Q. Okay.  And at some point did you live somewhere else besides California?

"A. Well, during that time I lived off and on in Atlanta, Georgia, with my father.

"Q. Do you remember how many years you lived in Atlanta?

"A. It was only when I was younger.  6th grade, 7th grade."

In response to a juror question, Howard testified to being 36 years old.

        b.  Closing Arguments Regarding Reinol's Geographic Origin Question and Use of the N-Word

During closing argument, defense counsel discussed the interaction that had occurred between Howard and Reinol before the shooting and asserted that Howard had reasonably believed he was in imminent danger.  Counsel noted that Reinol approached Howard "with a hostile demeanor, wanting to know where the guys [Howard] was with were from."  Counsel explained the import of Reinol's question regarding their

16

geographic origin as follows: "[Howard] told you that these words can have deadly consequences. In this type of an environment, when somebody approaches you and asks, 'Where are you from?' things can happen. And in fact that's what happened that night. [¶] [Reinol] then turned to [Howard] and called him a bitch and called him the n-word. [Reinol] sat down at that point. And he sat down because he was not in fear. And he was not in fear because he had a gun."

In rebuttal argument, the prosecutor responded: "[D]efense counsel said that [Reinol] walked up and called Mr. Howard the n-word. That's not accurate. Okay. [¶] In this world that we heard about for some weeks, that term was used as slang. And to say that it was used as the n-word, I don't think it's entirely a full picture in this situation." Defense counsel did not object to the prosecutor's statements. During trial, neither party had presented any evidence about the meaning or use of the n-word.

### c. Posttrial Assertions Regarding Howard's Personal and Geographical Background

In Howard's sentencing brief, defense counsel wrote that Howard "was born in Stanford, California on June 25th, 1985," "lived in East Palo Alto until age seven[,] and then his mother relocated him and his half-siblings to Menlo Park." Later, at age 10, Howard moved to Sunnyvale with his family. In addition, defense counsel explained that Howard had "spent approximately six months living with his father in Atlanta" when he was in the fifth grade and had returned to Atlanta for part of his sixth, seventh, and eighth-grade school years and one summer.

### d. Howard's RJA Motion and People's Opposition

Posttrial but prior to sentencing, Howard moved the trial court to vacate the jury's verdict and grant a new trial under section 745, subdivision (e)(1)(A) and (e)(4), and his

constitutional rights to due process and a fair trial.[11]  Alternatively, Howard asked the court to dismiss the firearm and out-on-bail enhancements or impose a lesser firearm enhancement (§ 745, subd. (e)(1)(C)).

In his motion, Howard identified himself as "African American."[12]  Citing a "History of East Palo Alto" posted on a County of San Mateo website, Howard asserted that "East Palo Alto has a reputation for being unsafe, violent, gang-related, and other negative connotations.  In 1992, East Palo Alto was dubbed the 'murder capital of the world [*sic*].'[13]  East Palo Alto, or EPA, was also historically predominately African American."  (Fn. omitted.)

Howard contended the prosecutor committed misconduct and violated his rights under the Act "by repeated questions trying to connect him to East Palo Alto."  He asserted "[t]here was no relevance to said questions other than to inflame the passions and prejudices of the jury.  . . .  Because East Palo Alto, or EPA, was historically an African American community and was known as the murder capital of the world [*sic*], the prosecution was seeking to introduce improper character evidence, and use Mr. Howard's racial background against him.  Asking a White defendant similar questions

---

[11] Section 745, subdivision (e)(1)(A) and (e)(4) allows the trial court to remedy a violation of the Act before entry of judgment by declaring a mistrial (if requested) or imposing "any other remedies available under the United States Constitution, the California Constitution, or any other law."  Although the Legislature amended section 745, subdivision (e) after the judgment was entered in this case, those amendments do not materially affect the remedies that Howard requested in his motion.  (See Stats. 2022, ch. 739, § 2; Stats. 2023, ch. 311, § 6; Stats. 2023, ch. 464, § 1.)

[12] The adjectives "African American" and "Black" are used interchangeably in this opinion.

[13] Although the web address for the "History of East Palo Alto" cited in Howard's motion appears to be no longer active, a "History of East Palo Alto" (dated Summer 2019) is currently available on the County of San Mateo website and states that "[b]y 1992, [East Palo Alto] had gained a reputation of being the *U.S.* 'murder capital' and was the nation's leader in per capita murders that year with 42 for a population of just 24,000."  (Italics added.)  (https://www.smcgov.org/district-4/history-east-palo-alto [as of Aug. 26, 2024], archived at: <https://perma.cc/VFR5-M2LP>.)

18

would not have happened in this trial and would not have evoked the same passion or prejudice.  Racial discrimination, whether explicit or implicit is no longer acceptable in the criminal courtroom given the passage of the Racial Justice Act."  Howard urged the court to find that he met his burden to show, by a preponderance of the evidence, a violation of the Act under section 745, subdivision (a)(2) (section 745(a)(2)).

The prosecutor responded that Howard's RJA motion should be summarily denied.[14]  The prosecutor asserted that, at trial, it appeared to him Howard "was not being entirely truthful about where he was, in fact, from."  The prosecutor contended, "Where [Howard] was brought up or which area he identified as being from is, in the abstract, irrelevant.  However, if [Howard] told a half-truth or created a misimpression about where he was from while testifying, it becomes very relevant."  Similarly, the prosecutor asserted that none of Howard's testimony regarding his personal and geographical background "directly related" to whether he killed Reinol but perhaps "was elicited as a counterbalance" to various negative evidence presented at trial.

The prosecutor submitted a declaration providing the bases for his belief that "Howard was from East Palo Alto/Menlo Park" and the reason why his "cross-examination questions challenging representations to the contrary were appropriate on the issue of his credibility."  The bases included that Dominicqueca T. had told the police she heard Reinol was "from Oakland or somethin[g] like that" and "the dude that shot him is from East Palo Alto."  The prosecutor also declared that "Howard has the words 'East Menlo Park' tattooed on his upper left arm."[15]

Additionally, the prosecutor argued that "the question of where [Howard] was actually 'from' became specifically relevant because it bore directly on the veracity of

---

[14] The prosecutor made no argument that Howard's claim was forfeited by his failure to object during the cross-examination.

[15] Although there was some evidence introduced at trial about tattoos on Howard's hand, there was no testimony or documentary evidence about tattoos on his upper arm or a tattoo containing the words "East Menlo Park."

[Howard]'s account of the alleged conversation that occurred right before the murder. If [Howard] misrepresented where he was 'from,' or there was ambiguity regarding where he was from (given his account of the conversation leading up to the shooting) that was a potentially fruitful and legitimate area of cross-examination. In other words, if [Howard] were 'from' San Jose and not East Palo Alto/Menlo Park, it would lend credence to his story about the gist of the conversation that preceded the shooting. If he were not from San Jose but 'from' East Palo Alto/Menlo Park, it would tend to undermine his version of events." The prosecutor further asserted that his cross-examination was "relevant for purposes having nothing" to do with Howard's race and, thus, excepted from section 745(a)(2), because that paragraph " 'does not apply if the person speaking is describing language used by another that is relevant to the case.' "[16]

The prosecutor challenged Howard's "assumptions" about East Palo Alto as "almost wholly false" and "completely unsupported." The prosecutor cited recent census data to show that "East Palo Alto is not predominantly African American." The prosecutor contended "there is no admissible evidence that the current reputation of East Palo Alto is prejudicially negative, that East Palo Alto is viewed as the 'murder capital of the world,' or that an objective observer would hold such a view." The prosecutor also noted that the very history of East Palo Alto cited by Howard described a significant decrease in crime in East Palo Alto since the 1990s. The prosecutor contended that the court could not reasonably infer based on this record that "knowing of [Howard]'s association with East Palo Alto would unduly inflame" or "unduly sway[]" the jury.

---

[16] At the time the prosecutor filed his opposition to Howard's RJA motion, the exception stated in section 745(a)(2) read as follows: "This paragraph does not apply if the person speaking is *describing* language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (Italics added.) The Legislature subsequently amended that exception by replacing the word "describing" with "relating." (See Stats. 2022, ch. 739, § 2, eff. Jan. 1, 2023.)

Additionally, the prosecutor argued that "[e]ven assuming that East Palo Alto has a continuing reputation for having an *excessively* high rate of criminal violence," any prejudicial association between Howard and East Palo Alto derived from the city's crime rate, not Howard's racial background, and thus did not implicate section 745.

The prosecutor contended that even if section 745 had been violated, absent a showing that the prohibited conduct prejudiced Howard, the remedy he requested (i.e., a new trial) is barred by the California Constitution (Cal. Const., art. VI, § 13).

Furthermore, regarding Howard's assertion that the cross-examination violated his constitutional rights, the prosecutor argued that Howard's constitutional claim should be "summarily denied as abandoned" because his motion did not provide "any case law or authorities in support of an argument . . . independent of the violation of section 745."

e. Trial Court Proceeding on Howard's RJA Motion

On the date set for sentencing, the trial court heard argument on Howard's RJA motion. As an initial matter, the court stated that it had not seen "any evidence" and had "no reason to believe" that Howard's trial was "tainted by racial bias on the part of the jury, counsel, or this court, or that the jury's verdict was the product of racism or bias against Mr. Howard because he's a Black man."

The trial court described Howard's RJA contentions variously, including as asserting that the prosecutor's cross-examination (regardless of intent) amounted to "a subtle but nonetheless a discernible message, a kind of a dog whistle . . . to any stereotypes jurors may have held about East Palo Alto and its Black population in the 1990s and early 2000s, when Mr. Howard would have been there."

The trial court explained that the prosecutor's cross-examination "was relevant in terms of impeaching Mr. Howard." The court added: "I questioned at the time . . . whether - - given that [the prosecutor] had other things to impeach Mr. Howard on, why [the prosecutor] would choose that, but I don't dispute the relevance of it." Defense counsel responded to the court's comment, asserting the prosecutor "did not have any

credible evidence to impeach [Howard] with to show that, in fact, he [was] lying. [The prosecutor] still doesn't have any." The court replied, "Well, Mr. Howard agreed, ultimately, that he was." Defense counsel conceded as much but remarked that Howard had agreed only "after being badgered after eight questions, but he kept on insisting that he wasn't from East Palo Alto, that he was born in Palo Alto."

Additionally, the trial court stated that it could consider and take "judicial notice of what the reputation generally was of East Palo Alto in the 1990s, whether it was true or not, it was certainly in the newspaper."

After acknowledging that the question presented by Howard's RJA motion was a "troubling" and "hard issue," the trial court denied the motion, ruling that Howard had failed to make a prima facie showing of a violation under section 745, subdivision (a)(1) or (a)(2). The court explained that the prosecutor's cross-examination "does not meet the definition of . . . exhibiting bias or animus because of Mr. Howard's race." The court did not explicitly state a ruling on Howard's related due process/fair trial claim or the prosecutor's argument that Howard had abandoned that component of his motion by failing to adequately brief it.

### 2. Legal Principles

"The express purpose of the Racial Justice Act is 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system . . . .' (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified].)" (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828 (*Bonds*).) "Whatever may be uncertain about the Racial Justice Act, there are a few things that are abundantly clear. Perhaps most obvious is that the Racial Justice Act was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias." (*Ibid.*)

22

"To further the goal of eliminating racial bias in criminal proceedings, subdivision (a) of section 745, provides that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.' " (*People v. Lashon* (2024) 98 Cal.App.5th 804, 809 (*Lashon*).) "The Act sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).) The category relevant here is in paragraph (2) of section 745, subdivision (a).

Current section 745(a)(2) provides: "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect."

Section 745, subdivision (h)(4) defines " '[r]acially discriminatory language' " as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."

Procedurally, a defendant may file a motion in the trial court alleging a violation of section 745, subdivision (a). (§ 745, subd. (b).) As of January 1, 2023 (i.e., after Howard's sentencing), section 745, subdivision (c) provides, "A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.

23

A motion that is not timely may be deemed waived, in the discretion of the court." (Stats. 2022, ch. 739, § 2.)  Further, as of January 1, 2024, section 745, subdivision (b) provides that "claims based on the trial record" may be raised "on direct appeal from the conviction or sentence" and "[t]he defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section." (Stats. 2023, ch. 464, § 1.)

"If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing." (§ 745, subd. (c).)

Under section 745, subdivision (h)(2), a " '[p]rima facie showing' means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred." "[A] 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (*Ibid*.)

The Court of Appeal in *Finley v. Superior Court* (2023) 95 Cal.App.5th 12 (*Finley*) examined the Act's prima facie standard.  The *Finley* court agreed with the petitioner that it "may initially look to the prima facie standard applicable to a petition for writ of habeas corpus, just as the Supreme Court has done in other contexts." (*Id*. at p. 21.)  The court explained further: "Although we agree that the type of information a defendant should present at the prima facie stage of a Racial Justice Act case is similar to the information a defendant should present in a habeas petition, the standard by which a court assesses the information is somewhat different.  In a habeas proceeding, 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.'  [Citation.]  Under the Racial Justice Act, the court does not ask if the defendant proffered facts sufficient to demonstrate actual entitlement to relief. Rather, the court asks if a defendant has proffered facts sufficient to show a 'substantial likelihood'–defined as 'more than a mere possibility, but less than a standard of more likely than not'–that the Racial Justice Act has been violated.  [Citation.]  The prima facie

24

threshold is thus lower than the preponderance of the evidence standard required to establish an actual violation of the Racial Justice Act." (*Id*. at p. 22.)

In other words, "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. [Citation.] And [] the court should not make credibility determinations at the prima facie stage." (*Finley*, *supra*, 95 Cal.App.5th at p. 23, fn. omitted; see also *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 131 (*Mosby*) ["*Finley*'s analysis provides a reasonable standard [for the prima facie case] based on long-standing habeas corpus law."].)

At a hearing under section 745, "evidence may be presented by either party" (§ 745, subd. (c)(1)) and "[t]he defendant shall have the burden of proving a violation of subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination." (*Id*., subd. (c)(2).)

Regarding our standard of review for the trial court's ruling that Howard failed to make a prima facie showing under section 745, the Attorney General states that "[a] de novo standard of review likely applies on appeal." Howard does not address the standard of review in his briefing but agreed at oral argument that de novo review applies. We agree and will apply the de novo standard to the trial court's legal conclusion that Howard had failed to carry his burden of making a prima facie showing. (See, e.g., *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 [" 'A denial at [the prima facie review] stage is appropriate only if the record of conviction demonstrates that "the petitioner is ineligible for relief as a matter of law." [Citations.] This is a purely legal conclusion, which we review de novo.' "]; *Maas v. Superior Court* (2016) 1 Cal.5th 962, 977–978 ["When a judge summarily denies a habeas corpus petition for failure to state a prima

25

facie case for relief, even in the absence of an informal response by the People, the judge has resolved a contested issue of law against the petitioner, that is, the judge has decided that the factual allegations set forth in the petition, even assuming they are true, do not entitle the petitioner to relief."]; *County of Sacramento v. Superior Court* (2012) 209 Cal.App.4th 776, 778–779 [court reviews de novo whether defendant made a prima facie case for summary judgment].)  As for a trial court's evidentiary conclusions, we generally review those for abuse of discretion.  (*People v. Dworak* (2021) 11 Cal.5th 881, 895.)

### 3. Analysis

#### a. RJA Claim Alleging Biased Cross-examination About East Palo Alto

Howard contends the prosecutor's cross-examination about his connection to East Palo Alto violated section 745 because it "appealed to racial bias," "invoked racial stereotypes," and "was irrelevant, baseless, and untrue."  He asserts that the trial court erred in finding no prima facie showing because "owing to our nation's long history of segregation, location-based phrases" have "become code words for Black criminality" and the prosecutor "was explicitly trying to use 'East Palo Alto' to impeach what he believed was a 'false aura of veracity' " that Howard had created by testifying about his place of birth and work history.  Howard contends that "deliberately arguing that a Black man is not from the white neighborhood he claims to be from and is instead from a Black neighborhood nearby reflects racial bias."

The Attorney General counters that the prosecutor's cross-examination regarding Howard's longstanding ties to East Palo Alto, in response to Howard's direct testimony that he was raised "[b]etween Menlo Park and San Jose," did not violate the Act or due process.  The Attorney General further contends "the prosecutor's cross-examination legitimately probed a subject that [Howard] raised in his own testimony; namely, where he was from and where his geographic allegiances lay.  Yet [Howard] argues that the

26

RJA should have precluded the prosecutor from challenging that aspect of his testimony, effectively allowing [Howard] to use the RJA to insulate his own testimony from scrutiny." The Attorney General asserts that "[i]t cannot be the case that a criminal defendant can testify at trial, 'open the door' to particular topics, then expect the RJA to prelude legitimate cross-examination because it could have incidental racial implications."[17]

Although "[a] witness may not be examined on matters that are irrelevant to the issues in the case" (*People v. Mayfield* (1997) 14 Cal.4th 668, 755 (*Mayfield*), abrogated on another ground by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2), the witness " 'may be cross-examined upon any matter within the scope of the direct examination.' " (*People v. Price* (1991) 1 Cal.4th 324, 474, quoting Evid. Code, § 773.) "The chief object of cross-examination is to test the credibility, knowledge, and recollection of the witness." (*People v. Watson* (1956) 46 Cal.2d 818, 827.) "[T]he law leaves to the triers of fact the exclusive right and duty to evaluate the evidence, determine its inherent value and to award to each witness the credibility which in the judgment of the jury the witness is entitled, based upon such considerations as the bias or prejudice, the candor or lack of candor of the witness, the reasonableness of his story, his relation to or interest, if any, in the outcome of the case, or the parties thereto." (*People v. Roberts* (1942) 50 Cal.App.2d 558, 566; see also *People v. Guerra* (2006) 37 Cal.4th 1067, 1128, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [noting that the jury could evaluate the defendant's testimony for "lack of candor"].)

" 'A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand.' [Citation.] 'When a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into

---

[17] The Attorney General makes no argument that Howard's RJA motion (filed after the jury's verdict) was untimely (see § 745, subd. (c)) or that Howard abandoned the due process component of his motion.

the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." ' [Citation.] Generally, . . . 'A prosecutor may honestly urge that a defendant lied. Convincing the jury that he did so is a potent weapon.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 333–334; see also *People v. Dykes* (2009) 46 Cal.4th 731, 764 ["The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony . . . . When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad."].)

Generally, an appellate court reviews a trial court's ruling on relevance or the propriety of cross-examination under the deferential abuse of discretion standard. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821; *Mayfield*, *supra*, 14 Cal.4th at p. 756.)

We agree with the trial court that the prosecutor's cross-examination of Howard about whether he grew up in East Palo Alto was, on its face, relevant (to his credibility and otherwise (see Evid. Code, § 210)) and permissible because Howard discussed the issue of his geographical background in his direct testimony. Howard testified on direct examination about where he was raised but did not mention East Palo Alto specifically. Based on Dominicqueca T.'s statement that she had heard Howard was from East Palo Alto, the prosecutor had reason to believe that Howard had failed to provide complete information about where he was raised when answering defense counsel's question, including that he was raised in East Palo Alto. In other words, the prosecutor had a good-faith basis for probing whether Howard had been less than entirely candid when he told the jury he had been raised "[b]etween Menlo Park and San Jose - - my whole life."

Howard testified additionally on direct examination that he took "personally" and was "offended" and "angered" by Reinol's comment that Reinol was not " 'one of these bitch-ass n[---]as from San Jose.' " Howard explained feeling that Reinol's comment was directed at him because he was the only person from San Jose present during this

interaction.  Although the record supports that Howard lived in San Jose for some period before the shooting, other information in the record supports that he had ties to East Palo Alto.  Thus, the prosecutor could properly seek to undermine the purported effect that Reinol's comment had on Howard because of his connection to San Jose by highlighting Howard's other geographical ties beyond San Jose, including East Palo Alto.

Notwithstanding our conclusion that the prosecutor's cross-examination and posttrial explanations for questioning Howard about his connection to East Palo Alto are supported by the record and facially race-neutral, we cannot under the RJA end our inquiry there.  That the record shows a permissible purpose for the questions asked and fails to show the prosecutor harbored express racial bias or animus against Howard does not necessarily mean that the prosecutor's conduct was free of implicit or implied bias.  (*Bonds*, *supra*, 99 Cal.App.5th at p. 829 ["To be sure, section 745 can be used to address a claim of purposeful discrimination.  But plainly that is not a statutory requirement, nor is it even the primary object of the statute."].)

The RJA states that a violation of the statute occurs when an attorney in the case used "racially discriminatory language" "or otherwise exhibited bias or animus" (§ 745(a)(2)), and it defines " 'racially discriminatory language' " without reference to whether the language was relevant to an issue in the case (§ 745, subd. (h)(4); cf. § 745(a)(2)).  The question here is whether the prosecutor used "language that, to an objective observer, explicitly or implicitly appeal[ed] to racial bias" (§ 745, subd. (h)(4)) or "or otherwise exhibited bias or animus towards the defendant because of the defendant's race . . ., whether or not purposeful" (§ 745(a)(2)).

A "central premise of the Racial Justice Act" is "that bias can be unconscious and implied as well as conscious and express" (*Bonds*, *supra*, 99 Cal.App.5th at p. 824).  In our de novo review, we must determine whether Howard made a prima facie showing that the prosecutor "used racially discriminatory language about [Howard]'s race . . . or otherwise exhibited bias or animus towards [Howard] because of [his] race . . ., whether

29

or not purposeful." (§ 745(a)(2).)  That is, we must decide whether Howard produced facts that, if true, establish "more than a mere possibility" of the use of racially discriminatory language about Howard's race or the exhibition of bias or animus towards Howard because of his race that is implicitly or impliedly biased.[18]  (§ 745, subds. (c), (h)(2); see *Finley*, *supra*, 95 Cal.App.5th at pp. 22–23.)

The trial court accepted as true that East Palo Alto had a reputation in the late 1980's and early 1990's (i.e., when Howard lived there) as a city in which there was relatively more criminal violence than in neighboring cities.  Howard also asserted in his RJA motion that East Palo Alto was "historically predominantly African American." While certain language that does not explicitly appeal to racial bias might satisfy the definition of " '[r]acially discriminatory language' " (§ 745, subd. (h)(4)) on its face, other such language may require a defendant to provide additional context and facts to make a prima facie case under the RJA.  As noted *ante*, "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim." (*Finley*, *supra*, 95 Cal.App.5th at p. 23.)

At oral argument in the instant matter, Howard's counsel acknowledged that the linked website would not be enough to establish an RJA violation at an evidentiary

---

[18] The Attorney General acknowledges that the exception provided in section 745(a)(2) for instances in which " 'the person speaking is relating language used by another that is relevant to the case' " "does not precisely apply to the prosecutor's reference to East Palo Alto."  We agree.  During trial, no one mentioned Howard's connection to East Palo Alto before the prosecutor asked Howard "Didn't you grow up in East Palo Alto?"  Further, we are not persuaded by the Attorney General's argument that this exception "illustrates the Legislature's general intent to allow attorneys to fairly address witness testimony and other relevant prior statements" without running afoul of the prohibitions stated in section 745(a)(2).  The Attorney General's assertion is not supported by the plain language of the statute or the express purpose of the RJA " 'to eliminate racial bias from California's criminal justice system' " (*Bonds*, *supra*, 99 Cal.App.5th at p. 828).

hearing. At the prima facie stage, the reference to the website was provided to "kind of shore up the allegations themselves." The Attorney General at oral argument conceded that the trial court may assume the matters Howard submitted or alleged concerning the historical reputation of East Palo Alto were true when deciding whether Howard established a prima facie case. Given the Attorney General's concession that the trial court could consider the allegations Howard made as true for purposes of the prima facie analysis, and in accordance with the *Finley* court's explication of the prima facie standard (*Finley*, *supra*, 95 Cal.App.5th at pp. 21–23), we accept as true Howard's assertions regarding the reputation and racial makeup of East Palo Alto during the time Howard lived there.[19]

Moreover, courts have recognized that a person's place of residence may serve as a proxy for race. (See, e.g., *People v. Turner* (2001) 90 Cal.App.4th 413, 420; *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 825–826 overruled on another ground by *United States v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1167.) In the same vein, our Legislature has categorized a "prospective juror's neighborhood" (Code Civ. Proc., § 231.7, subd. (e)(4)) as a presumptively invalid reason for exercising a peremptory challenge "unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race . . . and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Id*., subd. (e).)

The trial court had information before it that the Attorney General concedes could be accepted as true for the prima facie determination, including the statements in the motion about East Palo Alto's history of violence and its historical racial makeup, the link to the website, and the general reputation of East Palo Alto in the 1990's. Given

---

[19] As noted *ante* (pt. II.1.c.), the record contains information that would support a conclusion that Howard lived in East Palo Alto as a child (until age seven) from 1985 to 1992.

East Palo Alto's historical reputation and demographics, and the recognized connection between a person's place of residence, racial group, and negative stereotypes, we conclude that Howard "produce[d] facts that, if true, establish that there is . . . more than a mere possibility" (§ 745, subd. (h)(2)) that the prosecutor "used racially discriminatory language . . . or otherwise exhibited [racial] bias . . . towards [Howard]" (§ 745(a)(2)) by asking him about his connections to East Palo Alto where that fact had not been the subject of testimony by any prior witness. Even if the trial court did not abuse its discretion at the hearing on the RJA motion in deciding that Howard's connection to East Palo Alto was relevant "in terms of impeaching Mr. Howard" in light of Howard's direct testimony, the relevance of Howard's connection to East Palo Alto specifically was marginal in this case.

There was no evidence demonstrating that Howard's direct testimony about being raised "[b]etween Menlo Park and San Jose" was plainly false or that East Palo Alto falls outside the area between those two locations. Furthermore, Howard had mentioned on direct examination other cities in which he lived beside San Jose. That East Palo Alto was another in the list of places where Howard had resided as a child only minimally undermined his testimony that he was perturbed by Reinol's comment about him being from San Jose.

Under these circumstances, we conclude that Howard satisfied his initial minimal burden to produce facts that, if true, establish that there is more than a mere possibility of an RJA violation. Because Howard made the requisite showing in his RJA motion, the trial court erred in failing to hold a hearing on the alleged violation of section 745(a)(2). (See *Mosby*, *supra*, 99 Cal.App.5th at p. 131.)

Given that "evidence may be presented by either party" at the hearing (§ 745, subd (c)(1)), we will conditionally reverse the judgment and remand this matter to the trial court with directions to hold a hearing on Howard's RJA motion. (See *Mosby*, *supra*, 99 Cal.App.5th at p. 131; see also *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1259,

32

1269 [remanding for an evidentiary hearing upon finding the defendant had made a prima facie case for sentencing relief under section 1172.6].)

We emphasize that, in concluding Howard made a prima facie showing of an RJA violation under section 745 subdivision (c), we do not decide that Howard has established that the prosecutor's questions violated the Act. (§ 745, subd. (c)(2).) We decide only that the trial court erred in declining to hold an evidentiary hearing on Howard's motion. We express no opinion on whether Howard's RJA motion should be granted or denied following further proceedings. We also express no opinion on the remedy that should be imposed if the trial court were to find that Howard has proved a violation of the Act.

Having decided that this matter must be remanded for a hearing under section 745, subdivision (c), we do not address Howard's further, related claim that the prosecutor's cross-examination about East Palo Alto amounts to prosecutorial misconduct that violated his constitutional right to due process. At trial, the prosecutor contended that Howard had abandoned the constitutional component of his RJA motion by failing to brief it. Further, the trial court did not explicitly rule on Howard's constitutional claim when it denied his RJA motion. Under these circumstances and given that the hearing on remand will likely result in a more complete record concerning the prosecutor's conduct, we decide that the trial court should address Howard's constitutional allegation of prosecutorial misconduct in the first instance on remand. We express no opinion on whether Howard may have abandoned the constitutional component of his RJA motion or whether his constitutional allegation has merit.

b. RJA Claim Alleging Biased Rebuttal Argument About the N-Word

In his second RJA claim, Howard contends the prosecutor's argument that Reinol's use of the n-word before Howard shot him was "not offensive in Mr. Howard's 'world' " was not supported by the evidence, violated the RJA, and deprived him of due process. Howard asserts that the prosecutor's argument "rested on a racial assumption" that Howard, as "a Black man in 'this world that [the jurors] heard about for some

33

weeks[,]' . . . would not be offended by the n-word." Howard further asserts that "the prosecutor *othered* Mr. Howard, underscoring that, because of his race, he was different and less moral and credible than the jurors."

Howard acknowledges that his defense counsel did not object to the prosecutor's rebuttal argument or raise the issue in Howard's postverdict RJA motion. Nevertheless, Howard contends that forfeiture should not apply to his current claim and, in any event, his defense counsel's failure to object at trial amounts to constitutionally ineffective assistance of counsel.

The Attorney General responds that Howard's claim is forfeited on appeal. The Attorney General further contends that the claim lacks merit because the exception in section 745(a)(2)—which governs the circumstance of "relating language used by another that is relevant to the case"—applies to the prosecutor's argument. The Attorney General asserts that the prosecutor's argument was "a fair and direct" response to defense counsel's closing argument and it was not "unreasonable for the prosecutor to suggest that in some cultural contexts the word used by [Reinol] could be perceived as 'slang' rather than racial invective."

We decline to address Howard's second RJA claim in this appeal. The Legislature has "prescribe[d] a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions)." (*Lashon*, *supra*, 98 Cal.App.5th at p. 813; see *People v. Singh* (2024) 103 Cal.App.5th 76, 112–116.) Because Howard did not raise his second RJA claim in the trial court and given our conditional reversal of the judgment and remand for a hearing on Howard's first RJA claim, we do not decide whether forfeiture would apply in this appeal or otherwise address the merits of the second RJA claim. Instead, we conclude that, under the present circumstances, Howard may on remand raise his second RJA claim to the trial court, should he choose to do so.

34

We express no opinion on whether raising this second RJA claim on remand would be timely under section 745 or any other law. We also express no opinion on whether Howard has made a prima facie showing as to this claim.

B. *Instructional Error Claim*

Howard contends the jury instructions "failed to identify the absence of heat of passion and the absence of imperfect [self-]defense as elements of murder, and thus the instructions improperly relieved the prosecution of its burden of proof" to convict him of murder. He further contends "the voluntary-manslaughter instructions told the jury that they had to make affirmative findings about the existence of provocation and the defendant's belief in the need to use deadly force, further shifting the burden to the defense." Howard acknowledges that the voluntary manslaughter instructions (CALCRIM Nos. 570 and 571) instructed on the prosecution's burden to "disprove heat of passion and imperfect self-defense beyond a reasonable doubt." Nevertheless, he contends "the instructions as a whole contradicted themselves and thus failed to correctly instruct the jurors on what they needed to find. [Citation.] Taken together, therefore, the instructions improperly reduced the prosecution's burden of proof and denied Mr. Howard due process of law."

The Attorney General responds that Howard forfeited his instructional error claim by failing to object at trial and, in any event, his claim fails because there is no reasonable likelihood that jurors were misled about the elements of murder or the People's burden of proving the existence or nonexistence of each element. In addition, the Attorney General contends that any alleged instructional error was harmless beyond a reasonable doubt.

1. Additional Background

During the People's case in chief, the trial court provided the parties a set of tentative jury instructions. The set included instructions on self-defense, voluntary manslaughter, imperfect self-defense, and provocation. Defense counsel agreed that a self-defense instruction was "lawful and appropriate" under the evidence, and the court

35

noted that it had included a provocation instruction (CALCRIM No. 522) at defense counsel's request.

Later, after the parties had rested their cases and discussed the jury instructions with the trial court "in chambers," the court noted that it had made some changes to its tentative instructions and said, "there were no issues or disputes regarding the changes." The court also noted that it added, sua sponte, a "manslaughter, heat of passion instruction" (CALCRIM No. 570). Defense counsel did not object to the finalized jury instructions.

The trial court instructed the jurors with the following instructions on homicide: CALCRIM No. 500, as modified ("Homicide: General Principles"[20]); CALCRIM No. 505 ("Justifiable Homicide: Self-Defense"); CALCRIM No. 520 ("Malice Aforethought"); CALCRIM No. 521 ("First Degree Murder"); CALCRIM No. 522 ("Provocation: Effect on Degree of Murder"); CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense"); and CALCRIM No. 571 ("Voluntary Manslaughter: Imperfect Self-Defense – Lesser Included Offense").

2. Legal Principles

a. California's Homicide Law

Recently, in *People v. Schuller* (2023) 15 Cal.5th 237 (*Schuller*), our Supreme Court summarized California's homicide law (as relevant here):[21] "California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter. [Citation.] Murder is defined as 'the unlawful killing of a human being . . . with malice aforethought' [citation], while manslaughter is defined as

---

[20] We omit the boldface that appears in the titles of these jury instructions as duplicated in the clerk's transcript.

[21] Our Supreme Court decided *Schuller* two weeks after Howard filed his opening brief on appeal, but before the Attorney General filed his respondent's brief and Howard filed his reply brief. Nonetheless, the parties did not mention *Schuller* in their respective responsive briefs.

'the unlawful killing of a human being without malice' [citation]. Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' [Citation.] Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" [citation], or with awareness of the danger and a conscious disregard for life.' " (*Id*. at p. 252.)

" 'Generally, the intent to unlawfully kill constitutes malice.' [Citation.] However, California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]: (1) when a person kills ' " 'in a "sudden quarrel or heat of passion" [citation], or . . . [(2) when a person] kills in "unreasonable self-defense" — the unreasonable but good faith belief in having to act in self-defense [citations].' " ' [Citation.] 'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide." ' " (*Schuller*, *supra*, 15 Cal.5th at p. 252; see also *People v. Rios* (2000) 23 Cal.4th 450, 460 (*Rios*).)

The *Schuller* court explained that "given how California has chosen to structure its homicide laws, when imperfect self-defense [or sudden quarrel/heat of passion] is at issue in a murder case, the People must prove the absence of that circumstance 'beyond a reasonable doubt . . . in order to establish the . . . element of malice.' " (*Schuller*, *supra*, 15 Cal.5th at p. 253, citing *Rios*, *supra*, 23 Cal.4th at p. 462 [discussing provocation (i.e., sudden quarrel/heat of passion) and imperfect self-defense]; see also *Schuller*, at p. 257 ["[I]t is well established that when imperfect self-defense is at issue, the prosecution cannot establish malice without proving the absence of that circumstance beyond a reasonable doubt."].)

The *Schuller* court added, "California's standard jury instructions on voluntary manslaughter include this requirement.  (CALCRIM Nos. 570 [sudden quarrel/heat of passion], 571 [imperfect self-defense].)"  (*Schuller*, *supra*, 15 Cal.5th at p. 254.)

### b.  Jury Instruction Requirements and Appellate Review

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense."  (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)  " 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'  [Citation.]  That duty extends to instructions on the defendant's theory of the case, 'including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' "  (*People v. Townsel* (2016) 63 Cal.4th 25, 58.)  "[O]nce a trial court undertakes to instruct on a legal point, it must do so correctly."  (*Ibid*.)

Nevertheless, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal."  (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).)

" 'A claim of instructional error is reviewed de novo.  [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' "  (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218.)  " 'The challenged instruction is considered "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." '  [Citation.]  'We of course presume "that jurors understand and follow the court's instructions." ' "  (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816.)

### 3. Analysis

Howard acknowledges that his defense counsel failed to object to the homicide instructions. Notwithstanding the Attorney General's assertion of forfeiture, we reach the merits of Howard's claim of error because he contends the instructions were legally incorrect (i.e., "[t]hey omitted an element of the crime") and affected his substantial rights. (See *People v. Morales* (2021) 69 Cal.App.5th 978, 995, fn. 4; *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.)

Regarding the merits of Howard's claim, we are not persuaded that the homicide instructions here omitted an element of murder or misstated the burden of proof on heat of passion and imperfect self-defense. The trial court instructed the jury on malice aforethought using CALCRIM No. 520. That instruction is a correct statement of the law. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 999–1001; see also *People v. Knoller* (2007) 41 Cal.4th 139, 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1222 [upholding CALJIC No. 8.11, the analogue to CALCRIM No. 520].) For voluntary manslaughter based on sudden quarrel/heat of passion and imperfect self-defense, the trial court instructed the jury using CALCRIM Nos. 570 and 571. In *Schuller*, our Supreme Court stated that those CALCRIM instructions properly include the requirement that the prosecution disprove heat of passion and imperfect self-defense beyond a reasonable doubt. (*Schuller*, *supra*, 15 Cal.5th at p. 254.)

The trial court instructed the jurors to "decide whether the killing in this case was unlawful and, if so, what specific crime was committed" (CALCRIM No. 500). The court further instructed using CALCRIM No. 520 that the People had to prove malice aforethought to find Howard guilty of murder and if they decided Howard committed murder, it is second degree murder unless the People prove it is first degree murder under the instruction defining that offense (CALCRIM No. 521). (See also CALCRIM No. 522 [addressing provocation for purposes of determining the degree of murder and directing

39

the jurors to "consider the provocation in deciding whether the defendant committed murder or manslaughter"].)

Further, the voluntary manslaughter instructions informed the jurors that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion" (CALCRIM No. 570) or "because he acted in imperfect self-defense" (CALCRIM No. 571). This is an accurate statement of the law. (See *People v. Genovese* (2008) 168 Cal.App.4th 817, 830–832.) Importantly, these instructions also informed the jurors that the People had the "burden of proving beyond a reasonable doubt" that Howard "did not kill as the result of a sudden quarrel or in the heat of passion" and "was not acting in imperfect self-defense." Further, the instructions directed the jurors to acquit Howard of murder if the People failed to meet their burden.

In closing argument, the prosecutor acknowledged his burden of disproving heat of passion and imperfect self-defense. Defense counsel similarly highlighted the People's burden to disprove imperfect self-defense, quoting CALCRIM No. 571 directly: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, then you must find the defendant not guilty of murder."

The trial court instructed the jurors to "[p]ay careful attention to all of [its] instructions and consider them together." Howard fails to point us to anything in the trial record showing that the jurors did not follow the court's instructions or otherwise failed to understand the homicide instructions. Notwithstanding Howard's assertions of juror misunderstanding based on extrajudicial studies, we presume that the jurors understood and followed the instructions. (See *Lee*, *supra*, 51 Cal.4th at p. 652.)

We conclude that the instructions, read as a whole and in context of the record, properly advised the jury on the element of malice aforethought and properly placed the burden on the People to prove beyond a reasonable doubt the absence of sudden quarrel

40

or heat of passion and imperfect self-defense as a requirement for proving malice and finding Howard guilty of murder. (See *Schuller*, *supra*, 15 Cal.5th at pp. 252–254.)

C. *Cumulative Prejudice*

Although we have concluded that the trial court erred in denying Howard's RJA motion at the prima facie showing stage (see pt. II.A.3.a., *ante*), we discerned no other error in Howard's trial. Thus, there are no errors to consider cumulatively. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## III. DISPOSITION

The judgment is conditionally reversed, and the matter is remanded for further proceedings on defendant's motion under Penal Code section 745, consistent with this opinion. We otherwise affirm defendant's conviction and sentence. If the trial court denies the defendant relief on remand, the judgment will be reinstated. If the trial court grants the defendant relief on remand, the trial court shall conduct any further proceedings as necessary.

_____
Danner, J.

I CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

I CONCUR IN THE JUDGMENT ONLY:

_____
Wilson, J.

**H050156**
*People v. Howard*

Trial Court:     County of Santa Clara

Trial Judge:    Honorable Robert B. Hawk

Counsel:        Joseph Doyle, by appointment of the Court of Appeal under the Sixth
                 District Appellate Program, for Defendant and Appellant.

                 Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
                 General, Jeffrey M. Laurence, Senior Assistant Attorney General,
                 Alice B. Lustre, Supervising Deputy Attorney General and J. Michael
                 Chamberlain, Deputy Attorney General, for Plaintiff and Respondent.

**H050156**
*People v. Howard*